BENOLKEN v. UNITED STATES.

Civ. A. No. 38–50.

United States District Court,
D. Nebraska, Omaha Division.

Sept. 8, 1951.

724

Dan L. Kenny, of Kenny & St. Lucas, Omaha, Neb., for plaintiff.

Joseph T. Votava, U. S. Atty. for District of Nebraska, Omaha, Neb., for defendant.

DONOHOE, Chief Judge.

This is an action by Florence Benolken to recover compensation for losses allegedly sustained by her as a result of having been advised by representatives of the War Department that she was not entitled to have her household goods shipped at Government expense from Seattle, Washington, to Omaha, Nebraska, subsequent to the death in October, 1942, of her husband, Lieutenant Francis John Benolken, while serving on active duty in the Army of the United States. Jurisdiction is conferred upon this Court by Private Law 115, 81st Cong., Chap. 222, 1st Sess. S.189. Since the proceedings are governed by paragraph (20) of Section 24 of the Judicial Code, as amended, 28 U.S.C.A. § 1346, and Section

2402, the case was tried by the Court without a jury and after careful consideration of all the material evidence, the Court makes the following special

### Findings of Fact.

Plaintiff, during the years 1917 to 1928, resided in the city of Omaha, Nebraska, where she was employed by various law firms as a clerk and stenographer. In August, 1928, plaintiff married Francis John Bonolken and during the course of years that followed moved with him to various cities throughout the United States; and in 1937, plaintiff, with her husband and two children born of their marriage, took up permanent residence in the city of Seattle, Washington. Mr. Benolken was employed by the E. R. Squibb Company in Seattle from 1937 to 1939, and by the Bartel Drug Company in Seattle from 1939, until he enlisted in the United States Army in April of 1942.

Plaintiff and her husband had, in December of 1939, purchased for $3,450 a house at 4610 Wallingford Avenue, in Seattle, which house they occupied with their two children as a family home. Both plaintiff and her husband were registered to vote, and did vote, in Seattle. When Mr. Benolken, then Lieutenant Benolken, entered the Armed Forces, he lived at Fort Lewis, Washington, where he was stationed. However, Mrs. Benolken continued to reside at 4610 Wallingford Avenue with the two children, and Lieutenant Benolken would frequently visit his family over weekends at their home. Shortly after his entry into the service, Lieutenant Benolken deeded his interest in the property at 4610 Wallingford Avenue to plaintiff, who had the deed recorded November 11, 1942, and title to the property was then solely in plaintiff's name.

On October 5, 1942, Lieutenant Benolken, while still on active duty in the United States Army, died of a heart ailment in Seattle, Washington.

Immediately following Lieutenant Benolken's death, plaintiff received a visit from Captain Tegnell, who was at that time attached to Fort Stevens, Washington. Suffice it to say, without delving into the primary purpose of Captain Tegnell's visit, that he offered in a general way to assist plaintiff in any manner possible. Plaintiff made inquiries of Captain Tegnell in regard to having her household effects shipped from Seattle, Washington, to Omaha, Nebraska, at Government expense; and Captain Tegnell informed her that she should direct such inquiries to the Army Transportation Officer for the Seattle Area. It seems that shortly after Captain Tegnell's visit, plaintiff made inquiries of the Transportation Officer and was informed that she was not entitled to transportation of her household effects to Omaha, Nebraska, at Government expense.

Just prior to Christmas, 1942, plaintiff wrote to her brother, who evidently did not reside in Seattle, to enlist his aid in helping her move to Omaha; but he passed away before he could reach Seattle, so plaintiff, who was then in ill-health, decided to remain in Seattle until her health improved.

Approximately one year later, plaintiff decided not to remain any longer in Seattle. She contacted Bekins Van and Storage Company to ascertain how much it would cost to ship her household effects to Omaha, Nebraska. Mr. Blum, an employee of Bekins, estimated, during a telephone conversation with plaintiff, that it probably would not cost more that $500 to ship the goods. Plaintiff then gave Mr. Blum the order to pack the furniture, dishes and other household effects and take these effects to Bekins' Warehouse in Seattle to be shipped out of the state of Washington on instructions to be given by plaintiff when she arrived in Omaha, Nebraska. Bekins did so pack and ship the goods to its warehouse and plaintiff was billed $181 for this service. Plaintiff considered this charge exorbitant and went to see Mr. Blum about it. Mr. Blum informed her that there would be an additional charge of $2.50 per hundred pounds to crate the furniture and put it on the train, if shipped by rail, or it would cost $931 to ship it by van. Plaintiff, who was evidently very disgruntled after receiving this information, ordered the household effects stored, and sought aid from the Interstate Commerce Commission

and the Department of State for the state of Washington to alleviate the burden which resulted from what seemed to plaintiff extremely high shipping rates.

In the meantime, plaintiff was advised by various officers and wives of officers that she was entitled to have her household effects shipped to Omaha at Government expense. Consequently, she discussed this matter with Lieutenant Hooper, W.A.C., a personal relations officer of the United States Army, with offices in downtown Seattle. After carefully listening to, and considering, the information given by plaintiff, Lieutenant Hooper consulted with her superior officers, and then advised the plaintiff that she was not entitled to transportation of the household effects at Government expense. At this time Lieutenant Hooper called the plaintiff's attention to the laws and regulations governing the transportation of a deceased soldier's effects.

Plaintiff waited in Seattle for thirty days after receiving this advice in an effort to secure cheaper transportation for her household furnishings, but had no success. She testified that it cost her ten dollars per day more to live in Seattle during these thirty days than it would have cost her had she remained in her home.

Sometime in July, 1944, plaintiff with her two children left Seattle for Omaha. A few days after her arrival here, she consulted with the Transportation Officer of the Seventh Service Command in regard to having the household effects which were stored in Seattle shipped to Omaha. He advised her that she was entitled to have the shipment made at Government expense. Evidently there was some difficulty in obtaining authorization for the shipment because the time within which the shipment could be authorized had expired. The Court infers this from plaintiff's letter to the Commanding General of the Seventh Service Command, dated November 24, 1944, in which she requests the Commanding General to authorize shipment of her household effects even though the one year time limit for such shipment had expired. An affidavit, dated January 12, 1951, in which plaintiff refers to the advice given her by Captain Tegnell and Lieutenant Hooper, indicates why she failed to make her application for transportation within the one-year time limit. Sometime after this affidavit was submitted to the proper authorities, authorization for shipment by the Government of the plaintiff's household effects was approved.

The household effects were at this time in the possession of Bekins Van and Storage Company and apparently that Company would not allow the Government to take the goods and ship them to Omaha until certain crating, packing and storage charges owed by plaintiff to Bekins has been paid. Exhibit 2. It is clear from the evidence that plaintiff engaged in a dispute over the propriety of these charges and who was to pay them. Plaintiff transmitted a check to her lawyer in the sum of $122.88 to cover the items she felt were to be paid by her. Exhibit 3. Bekins, however, did not release the goods until she advanced a total sum of $306.43. Exhibit 5. That the Government was not the cause of, or a party to, this dispute becomes readily apparent by an examination of some of the individual items giving rise to the differences between the parties. For example: Bekins claimed a $7 insurance premium on insurance which plaintiff claimed to have canceled; Bekins claimed $35 for mothproofing which plaintiff claimed had been reduced to $9. The Government could not get possession of the goods until these differences were settled, the debt satisfied and the goods released by Bekins; and as nearly as the Court is able to discern, this occurred sometime after March 12, 1945, and prior to May 18, 1945. Exhibits 4 and 5. The household effects were delivered at Government expense to plaintiff in Omaha, Nebraska, in June of 1945.

## Discussion

In determination of the claim of plaintiff, the United States is to be held liable for damages, and for any negligent or wrongful acts or omissions of any of its officers or employees, to the same extent as if the United States were a private person in accordance with the law of the place where the act or omission occurred. Private Law 115, 81st Congress, Chapter 222,

1st Session (S. 189). See also 28 U.S.C.A. § 1346(b). Plaintiff seems to base her right to recover on the proposition that erroneous advice negligently given to her by defendant was the proximate cause of certain damages to her.[1] The Court, however, must deny her claim.

First. The advice given was not erroneous. Paragraph III of the complaint alleges: " * * * that plaintiff requested the defendant United States of America, through an army officer real name unknown, that *plaintiff's* household goods be transported from Seattle, Washington to Omaha, Nebraska, plaintiff's permanent residence; that the defendant, through and by its agent and representative, said above-referred to army officer, did then and there erroneously and negligently advise plaintiff that defendant had no authority to pay for transportation of the above mentioned household goods from Seattle, Washington to Omaha, Nebraska."

Plaintiff contends that the Government was authorized to transport these goods by virtue of Section 1584, Title 10, United States Code Annotated, Article of War 112, and the following regulation issued by the Secretary of War in conjunction therewith: "The effects of officers, including officers of the Army of the United States, * * * who die in the service may be shipped from their last duty station to such places as may be the homes of their legal heirs." Title 10, Cum.Supp., Code of Federal Regulations, Sec. 93.8(a)

(2), P. 3726. Plaintiff was not an Army officer and the foregoing regulation cannot be said to authorize shipment of her effects. The United States Attorney called this matter to the attention of counsel for plaintiff at the pretrial conference, but counsel felt that an amendment to the complaint was unnecessary on the assumption that plaintiff's effects were the effects of her husband. Although this assumption may be correct, it is a matter which requires accurate pleading and proper proof. Of course, if there had been a showing that the household goods involved were the property of the deceased soldier, the Court could allow the pleadings to be amended to conform to this showing under Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A.; but in the absence of this showing, the Court cannot make a finding that the goods were those of the deceased soldier. However, this case need not be decided on this narrow, and, what may seem to the plaintiff, rather technical point, for even if the household goods were the property of plaintiff's deceased husband, the Government was not authorized to pay for transportation of these effects to Omaha, Nebraska.

The regulation provided that "the goods may be shipped to such places as may be the homes of their (the deceased officer's) legal heirs." 10 Cum.Supp. C.F.R., Sec. 93.8(a) (2). Whether the term "home" be defined in the narrow sense of domicile or in the broader sense of residence,[2] the evidence does not establish

1. Though no authorities on this proposition are cited by counsel for plaintiff in his brief, it seems that he relies on the rule that a false statement negligently made may be the basis of a recovery of damages for injury or loss sustained in consequence of reliance thereon. See 65 C.J.S., Negligence, § 20, p. 428, n. 10.

2. " 'Domicile,' strictly speaking is the relation which the law creates between an individual and a particular place or country, and each case is dependent upon its own particular facts. 'Domicile' is not in a legal sense synonymous with 'residence.' A person may have more than one residence and more than one home, in the ordinary acceptance of those terms, but he can have only one 'domicile,' and the law requires that for the succession of his property, he be domiciled somewhere. The word 'home' is the fundamental idea of 'domicile,' and the fact that one calls a place his 'home' may not be of much weight in determining whether or not it is his 'domicile.' To constitute a 'domicile' there must be a fixed habitation or abode in a particular place, and the intention to remain there permanently. There must be 'residence,' actual or inchoate, and the non-existence of any intention to make a 'domicile' elsewhere, and these two elements must concur. As said by Dicey in his Conflict of Laws, p. 79: 'The domicile of any person is, in general, the place or country which is in fact his

that plaintiff, the legal heir of Lieutenant Benolken, had a home in Omaha, Nebraska, at the time she sought advice from the defendant's agents in Seattle. On the contrary, her home, and only home at that time, was at 4610 Wallingford Avenue in Seattle, Washington. Consequently, the advice of the defendant's employees was not erroneous.[3]

■ Second. Even if the information given to plaintiff by defendant's agents was erroneous, there is no proof of negligence. Plaintiff has not shown that defendant's agents were negligent in forming an erroneous opinion on inadequate data, or in defectively communicating an accurate opinion. The facts which served as a basis for the opinion of the Transportation Officer and Lieutenant Hooper were peculiarly within the knowledge of plaintiff and were related by her to these Government officials. The advice given to plaintiff in regard to shipment of her household furnishings was merely an opinion as to the legal consequences flowing from a given set of facts, known by plaintiff as well, if not better, than by defendant. Under these circumstances, the information was nothing more than a representation as to a matter of law, and ordinarily a person is not justified in relying on such a representation. Some authorities reason that everyone is presumed to know the law, and therefore cannot, in legal contemplation at least, be misled by erroneous statements of law; other authorities reason that a statement of law is merely an expression of opinion and that the hearer has no right to rely on such a statement since all parties have equal opportunity to find the law. 37 C.J.S., Fraud, § 55, p. 324, notes 66 to 71 incl.[4] These reasons are of course subject to criticism and may seem entirely unrealistic in many situations. Cf. Restatement, Torts (1938 Ed.) Section 545(2) and 542, which sets forth a more acceptable rule. However, there is nothing in the present case calling for a departure from the general rule. The plaintiff was charged with notice of the regulations governing shipment of the effects of a deceased soldier. 49 Stat. 502, 44 U.S.C.A. § 307. Cf. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10. In addition to this constructive notice, defendant's agent, Lieutenant Hooper, called plaintiffs attention to the regulations, thereby giving her actual notice of their content. Plaintiff had some knowledge of legal matters since she had worked for many years in law offices in the city of Omaha. She had available her

permanent home, but is in some cases the place or country which, whether in fact his home or not, is determined to be his home by a rule of law.' In regard to a change of domicile, the court says: 'Mere change of residence is not of itself proof of a change of domicile unless accompanied by an intention, express or implied, to abandon the old domicile and acquire a new one. Within the principle of law declared in the decisions, a person may reside for pleasure or health in one place without forfeiting or surrendering his domicile or legal residence in another, if he so intends. It is not residence alone, but it is the intention of the person, expressed or implied from the facts in evidence, *conjoined with residence*, that determines domicile. Every person sui juris and capable of controlling his personal movements may change his domicile at pleasure, but a change of domicile involves intention as the dominant factor. To constitute a change of domicile three things are essential: (1) *Residence in another place;* (2) an intention to abandon the old domicile; and (3) an intention of acquiring a new one; or, as some writers express it, there must be an animus non revertendi and an animus manendi, or animus et factum." (Emphasis added.) *19 Words and Phrases,* p. 584.

3. It is not necessary to discuss Section 1012 of Title 50 U.S.C.A.Appendix and the regulations, Sec. 93.1-7 Cum.Supp. C.F.R., p. 3722, issued in conjunction therewith, since these provisions only apply to those who die *as a result of* naval or military operations, 21 Dec.U.S.Comp. Gen. 1090, and since plaintiff does not rely on them.

4. Most of the cases which the court has examined in regard to reliance have arisen in connection with the intentional tort of deceit; but whether the representation is intentional or negligent, it would seem plaintiff cannot recover unless entitled to rely on the representation. See Harper on Torts, Sec. 76, 222 and 224.

counsel, Mr. Morrissey, who was retained in connection with the dispute that plaintiff had with Bekins over release of these same household goods. Under these circumstances it does not seem that plaintiff could justifiably rely on the information given to her by defendant's agents in Seattle.[5] In addition to this, the Court doubts very seriously that plaintiff did actually rely on this information since she continued to seek information from others.

■ Third. Most, if not all, of the expenses for which plaintiff seeks reimbursement, were not incurred as a proximate result of the advice given by defendant's agents. An act or omission is the proximate cause, where there is no intervening, independent, culpable and controlling cause, or, in other words, where there is an unbroken connection between the act and the damages. 25 C.J.S., Damages, § 19, p. 474.

■ (a) Plaintiff claims that as a direct result of the advice given to her by defendant's agents she was forced to remain in Seattle, Washington, for thirty days after she had given up her home in order to make arrangements to have her household goods shipped to Omaha, Nebraska, and that it cost ten dollars a day more to live during this time than it would have cost if she had remained in her home. It can hardly be contended that the advice of defendant's agents caused plaintiff to sell her home; nor can it be said that this advice caused plaintiff to remain in Seattle. It might have been suggested that defendant's refusal to ship the goods caused plaintiff to remain in Seattle, but the undisputed evidence establishes the fact that plaintiff had ample funds to ship her goods to Omaha; and that she delivered these goods to Bekins Van and Storage Company for that very purpose. However, because of her own dissatisfaction with the cost of shipping, she ordered the goods stored instead of shipped. Her decision in this regard was an independent cause of the damages for which she now seeks recovery.

Obviously she is not entitled to recover for pecuniary losses incurred solely by reason of her own carelessness and lack of good judgment.

■ (b) Plaintiff seeks reimbursement for the premium on a policy of insurance which she carried on the household goods while they were stored with Bekins. For the reasons set forth in the preceding paragraph, defendant is not to be blamed for plaintiff's decision to store the goods.

■ (c) Plaintiff asks compensation for the cost of living for four and one-half months in Omaha, Nebraska, without her furniture, to the extent that this cost exceeded what it would have cost her to live in Omaha if she had had her furniture. The evidence shows that the delay in shipment of plaintiff's household effects did not result from any acts or omissions of defendant, but resulted from plaintiff's dispute with Bekins over the storing, packing and crating charges, and her failure to promptly satisfy her debt in this regard to Bekins so that Bekins would release her furniture to the Government.

■ (d) As to plaintiff's claim for $306.43 for storing, crating and packing charges, it is clear that this expense, certainly insofar as it represents storing charges, was not proximately caused by any act or omission of defendant, or its agents.

■ In conclusion, it should be mentioned that plaintiff, shortly after the death of her husband, had available enough money to cover the cost of shipping her household effects to Omaha, Nebraska. If she had immediately shipped the goods when she first decided to leave Seattle she would have avoided the greater portion of her alleged damages. It is elementary that no recovery may be had for losses which the person injured might have prevented by reasonable efforts and expenditures. American Can Co. v. Russellville Canning Co., 8 Cir., 1951, 191 F.2d 38; 25 C.J.S. Damages, § 33, p. 499.

---

5. Under the circumstances mentioned, even under the more liberal rule of the Restatement of Torts, Section 542, plaintiff's reliance would not be considered justifiable.

For the reasons stated, plaintiff's claim must be denied. The United States Attorney shall prepare and submit for approval the appropriate judgment to be entered in accordance with this memorandum.